**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0734n.06

No. 12-3769

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Aug 08, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ALI KASSEM ABOU KHODR, | ) | |
| | ) | |
| **Petitioner,** | ) | ON PETITION FOR REVIEW |
| | ) | OF A FINAL ORDER OF |
| v. | ) | THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ERIC H. HOLDER, Jr., Attorney | ) | |
| General of the United States, | ) | |
| | ) | **O P I N I O N** |
| **Respondent.** | ) | |
| | ) | |

Before: SILER, MOORE, and ROGERS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Ali Kassem Abou Khodr ("Abou Khodr") assisted the government's investigation into an international drug-smuggling conspiracy of which he was formerly a member. Abou Khodr's assistance earned him a relatively short sentence of imprisonment, which he has since completed. Thereafter, Abou Khodr sought to defer his removal from the United States on the basis of that same assistance. Abou Khodr petitions us to reverse the immigration judge's ("IJ") decision denying Abou Khodr relief from removal, which the Board of Immigration Appeals ("BIA") affirmed in a separate opinion. We **DENY** Abou Khodr's petition.

**I. BACKGROUND AND PROCEDURE**

Abou Khodr, a Lebanese citizen, was lawfully admitted to the United States on September 29, 1996. Administrative Record ("A.R.") at 153 (IJ Oral Decision ("Dec.") at 2). On January 14, 2002, he pleaded guilty in the U.S. District Court for the Eastern District of Michigan to one count

of conspiracy to possess with intent to distribute and to distribute heroin in violation of 21 U.S.C. § 846. A.R. at 851–52 (Rule 11 Plea Agreement at 1–2); *see also United States v. Abou-Khodr*, No. 2:99-cr-81073 (E.D. Mich. 2004), R. 349 (Judgment at 1) (Page ID #229). Due to Abou Khodr's continued assistance to the government's investigation of the conspiracy, the district court delayed entering judgment until May 24, 2004, at which point it sentenced Abou Khodr to a term of six months of imprisonment and two years of supervised release. *United States v. Abou-Khodr*, No. 2:99-cr-81073, R. 417 (Sent. Hr'g Tr. at 6) (Page ID #1461). Abou Khodr completed his term of imprisonment on August 1, 2005, and thereafter completed his term of supervised release. A.R. at 153 (IJ Oral Dec. at 2).

The government began removal proceedings before Abou Khodr completed his term of imprisonment. In January 2010, Abou Khodr admitted the factual allegations asserted in his Notice to Appear, and conceded removability. *Id.* at 156 (IJ Oral Dec. at 5); *see* A.R. at 1026–27 (Notice to Appear at 3–4). He applied for asylum, withholding of removal under both the Immigration and Nationality Act ("INA") and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture" or "CAT"), and sought deferral of removal under the CAT. The IJ conducted hearings on April 14, 2010, and May 4, 2010, during which the IJ accepted evidence and testimony in support of Abou Khodr's application.

Abou Khodr's assistance to the government formed the basis of his application and testimony. He testified to three instances in which he assisted the government's investigation into Hassan Hamdar, a resident of Lebanon and suspected importer of heroin to the United States. First, Abou Khodr arranged a meeting between Hamdar and a cooperating third party to occur in Cyprus,

2

which Abou Khodr testified would have allowed for Hamdar's extradition to the United States. A.R. at 161–62 (IJ Oral Dec. at 10–11). The meeting never occurred; Abou Khodr testified that he believed this was because Lebanese authorities informed Hamdar of the meeting's true purpose. *Id*. Second, Abou Khodr testified that he informed federal agents of the date and delivery location of one of Hamdar's shipments of heroin to the United States, and informed the government that Hamdar wove heroin-filled straws into prayer rugs in order to evade scrutiny by customs. *Id*. at 162–65 (IJ Oral Dec. at 11–14). Third, Abou Khodr testified that he told federal agents the location of heroin already inside the United States. *Id*. at 165 (IJ Oral Dec. at 14). Abou Khodr believes that Hamdar has discovered or will discover his assistance to the government, that Hamdar has close ties to the Lebanese government, and that Hamdar will employ these connections to harm Abou Khodr if Abou Khodr returns to Lebanon.

Although he testified at length regarding his assistance to the government, Abou Khodr refused to testify with respect to his participation in the drug conspiracy. In describing his assistance, Abou Khodr repeatedly downplayed his involvement in the conspiracy. *See* A.R. at 163, 166–67 (IJ Oral Dec. at 12, 15–16). However, when cross-examined about his involvement, Abou Khodr invoked his Fifth Amendment privilege against self-incrimination on the basis that he intended to attack collaterally his federal conviction, and that his testimony could be used against him in a retrial of his criminal proceedings were his conviction set aside.[1] A.R. at 373, 400–01 (Removal Hr'g Tr. at 146, 172–73).

---

[1]Immediately before Abou Khodr's removal hearing, the Supreme Court announced that a failure to inform an alien of the immigration consequences attendant to a guilty plea may rise to the level of ineffective assistance of counsel. *Padilla v. Kentucky*, 559 U.S. 356 (2010). The Supreme Court decided earlier this year that *Padilla* does not apply retroactively to convictions entered before March 31, 2010. *Chaidez v. United States*, — U.S. — , 133 S. Ct. 1103, 1105 (2013).

Professor Shaul Gabbay, an expert on Middle Eastern affairs, also testified at the hearing regarding Abou Khodr's assistance. In light of Abou Khodr's assistance to the government, Gabbay concluded that Abou Khodr "will face extreme danger with a very high probability, certainty, that he will be killed, tortured by the constituencies at the personal specific level who are looking for him." A.R. at 174 (IJ Oral Dec. at 23); *see also* A.R. at 521–47 (Professional Analysis for the Case of Ali Abou-Khodr). Gabbay identified several scenarios to support his conclusion. First, he testified that Abou Khodr's cooperation with respect to a Lebanese drug conspiracy would make him a target of Hezbollah, either because Hezbollah believes the United States to be its enemy, or because Hezbollah participates in the sale of illegal drugs. A.R. at 174–76 (IJ Oral Dec. at 23–25). Second, Gabbay testified that Abou Khodr's cooperation would lead the Lebanese government to perceive him as a spy. *Id.* at 176–77 (IJ Oral Dec. at 25–26). Third, Gabbay testified that Abou Khodr's domestic drug conviction may result in his being imprisoned in Lebanon, which would bring him into closer contact with Hezbollah. *Id*. at 177 (IJ Oral Dec. at 26).

The IJ denied Abou Khodr each form of relief from removal. She found that Abou Khodr's conviction precluded his eligibility for asylum, withholding of removal under the INA, and withholding of removal under the CAT. *Id*. at 205 (IJ Oral Dec. at 54). She then found that Abou Khodr did not merit deferral of removal under the CAT because he was not credible, *id.* at 205–11 (IJ Oral Dec. at 54–60), and that even if he were credible, the evidence presented would not have established that Abou Khodr was entitled to CAT protection, *id*. at 211–19 (IJ Oral Dec. at 60–68).

Abou Khodr appealed to the BIA the IJ's denial of his application for deferral of removal, which the BIA dismissed in its own opinion. A.R. at 3 (BIA Op. at 1). With respect to credibility, the BIA rejected Abou Khodr's argument that the IJ drew an impermissible adverse inference from

Abou Khodr's invocation of his Fifth Amendment privilege against self-incrimination. *Id*. at 4–5 (BIA Op. at 2–3). The BIA also affirmed the IJ's finding that evidence in the record contradicted Abou Khodr's characterization of his participation in the conspiracy as limited. *Id.* at 5 (BIA Op. at 3). Next, the BIA concluded that Abou Khodr's additional evidence failed to establish that he was entitled to CAT protection.[2] In particular, it identified several reasons to conclude that Gabbay's testimony was not persuasive. *Id.* First, Gabbay relied heavily on Abou Khodr's own statements regarding his assistance to the government, but Abou Khodr had been determined to be not credible. Second, the BIA concluded that Gabbay's explanation of Hezbollah's tactics—in particular, why Hezbollah had not previously targeted Abou Khodr's family members—was inconsistent with descriptions of Hezbollah in various State Department's country reports on Lebanon. Third, no other evidence in the record supported Gabbay's theory that Lebanon would deem Abou Khodr to be a spy. The BIA dismissed Abou Khodr's appeal.

Abou Khodr timely petitioned for review of the BIA's decision. On August 1, 2012, the Sixth Circuit granted Abou Khodr's uncontested motion to stay his removal pending review of his petition.

## II. DEFERRAL-OF-REMOVAL CLAIM

### A. Regulatory Framework

Abou Khodr's appeal to the BIA and his petition to this court address only whether he is entitled to deferral of removal under the CAT. Under regulations implementing the CAT, "[i]f the immigration judge determines that the alien is more likely than not to be tortured in the country of

---

[2]The IJ heard testimony from Abou Khodr's son and one of his brothers. Because Abou Khodr does not contest the BIA's discounting of this testimony in his petition in this court, *see* A.R. at 5 (BIA Op. at 3), and because neither testimony is discussed in his petition in this court, we do not recount the details of this testimony.

removal, the alien is entitled to protection under the Convention Against Torture." 8 C.F.R. § 1208.16(c)(4); *see Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006) (stating that "an alien . . . must establish a particularized threat of torture" (internal quotation marks omitted)).

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted *by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity*.

8 C.F.R. § 1208.18(a)(1) (emphasis added); *accord Ben Hamida v. Gonzales*, 478 F.3d 734, 741 (6th Cir. 2007). The alien bears the burden of "establish[ing] that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." § 1208.16(c)(2).

If an alien is entitled to protection under the CAT, "[p]rotection . . . will be granted either in the form of withholding of removal *or in the form of deferral of removal*." § 1208.16(c)(4) (emphasis added). Ordinarily, an alien entitled to CAT protection receives relief in the form of withholding of removal. However, an alien will instead receive deferral of removal when the following conditions are satisfied: the alien "has been ordered removed; has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3)." 8 C.F.R. § 1208.17(a). Deferral of removal offers temporary relief, in that it may be terminated under specific circumstances by an IJ, by the Attorney General, or by the alien himself. § 1208.17(d)–(f). The parties agree that Abou Khodr has been ordered removed, and that he is subject to a mandatory

6

denial of withholding of removal. They dispute whether Abou Khodr is entitled to protection under the CAT, and thus may obtain deferral of removal.

**B. Standard and Scope of Review**

The IJ denied Abou Khodr's application for deferral of removal, and the BIA dismissed his appeal in its own opinion. "Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id*. Questions of law are reviewed de novo. *Shaya v. Holder*, 586 F.3d 401, 405 (6th Cir. 2009). "We review factual findings under a substantial evidence standard in which we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Parlak v. Holder*, 578 F.3d 457, 462 (6th Cir. 2009) (internal quotation marks omitted), *cert. denied*, 130 S. Ct. 3445 (2010). Factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

The parties agree that we may review "constitutional claims or questions of law raised upon a petition for review." 8 U.S.C. § 1252(a)(2)(D). However, they disagree over whether § 1252(a)(2)(C)—which would strip our jurisdiction to review any other claims—applies to Abou Khodr's petition in light of the fact that Abou Khodr raises only a deferral-of-removal claim. Section 1252(a)(2)(C) states as follows:

> Notwithstanding any other provision of law (statutory or nonstatutory), . . . and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having

7

committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title.

8 U.S.C. § 1252(a)(2)(C). Abou Khodr does not contest that his conviction constitutes an aggravated felony for purposes of § 1227(a)(2)(A)(iii) and a controlled-substance offense for purposes of § 1227(a)(2)(B). Accordingly, the parties apparently agree that, if § 1252(a)(2)(C) applies to deferral-of-removal claims in general, then it applies to Abou Khodr's petition in particular.

Several circuits have assumed without discussion that § 1252(a)(2)(C) applies to deferral-of-removal claims.[3] *Gallimore v. Holder*, 715 F.3d 687, 690 (8th Cir. 2013); *Perez-Guerrero v. U.S. Attorney Gen.*, 717 F.3d 1224, 1230–31 (11th Cir. 2013); *Pieschacon-Villegas v. Attorney Gen. of U.S.*, 671 F.3d 303, 309 (3d Cir. 2011); *Saintha v. Mukasey*, 516 F.3d 243, 248 (4th Cir.), *cert. denied*, 555 U.S. 1031 (2008). Meanwhile, two circuits that have given sustained attention to the question have concluded—albeit for different rationales—that § 1252(a)(2)(C) does not apply to deferral-of-removal claims. *Wanjiru v. Holder*, 705 F.3d 258, 263–65 (7th Cir. 2013); *Lemus-Galvan v. Mukasey*, 518 F.3d 1081, 1083–84 (9th Cir. 2008). We need not address this complex statutory-interpretation question because we conclude for the reasons provided *infra* that, even assuming that § 1252(a)(2)(C) does not apply to Abou Khodr's petition, nevertheless the BIA's

---

[3]It is unsettled whether § 1252(a)(2)(C)'s applicability to deferral-of-removal cases remains an open question in the Sixth Circuit. The government initially argued that we applied § 1252(a)(2)(C) to a deferral-of-removal claim in *Tran v. Gonzales*, 447 F.3d 937 (6th Cir. 2006). There is some support for this position; for example, we stated in *Tran* that the IJ "*deferred* [Tran's] deportation because Tran qualified for protection under the Convention Against Torture (CAT)." *Id.* at 938 (emphasis added). However, in describing the same event later in our opinion, we stated that "the IJ granted *withholding of removal* under the CAT," *id.* at 944 (emphasis added). For its part, the government reversed its position at oral argument in the case at bar, and now asserts that *Tran* was a withholding-of-removal case rather than a deferral-of-removal case.

determination was supported by reasonable, substantial, and probative evidence on the record

considered as a whole.[4]

---

[4]Our decision to dismiss Abou Khodr's petition on the merits is consistent with the Supreme Court's disfavor of "hypothetical jurisdiction"—the practice of assuming jurisdiction exists in order to dispose of the case more easily on the merits—in the context of Article III. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–97 (1998). Following *Steel Co.*, we "not[ed] that a majority of the Justices agreed that in certain circumstances assuming jurisdiction is appropriate, so long as the jurisdictional issue is difficult and resolving the case on the merits favors the party contesting jurisdiction." *United States v. Caruthers*, 458 F.3d 459, 472 n.6 (6th Cir.) (citing *Phillips v. Ameritech Info. Sys., Inc.*, No. 97-1942, 1999 WL 96650, at *2 n.1 (6th Cir. Feb. 5, 1999) (unpublished opinion)), *cert. denied*, 549 U.S. 1088 (2006). Since then, several circuits have interpreted *Steel Co.* to permit courts to assume that *statutory* jurisdiction—as distinct from *constitutional* jurisdiction—exists in order to resolve a case, by means of a straightforward merits analysis, in favor of the party contesting jurisdiction. *E.g.*, *Minesen Co. v. McHugh*, 671 F.3d 1332, 1337 (Fed. Cir. 2012) ("While we are generally obligated to resolve jurisdictional challenges first, Supreme Court precedent only requires federal courts to answer questions concerning their Article III jurisdiction—not necessarily their statutory jurisdiction—before reaching other dispositive issues."); *Jordon v. Attorney Gen. of U.S.*, 424 F.3d 320, 325 n.8 (3d Cir. 2005) (concluding that "*Steel Co*. . . . should not be understood as requiring courts to answer all questions of jurisdiction, broadly understood, before addressing the existence of the cause of action sued upon" and therefore avoiding a difficult exhaustion question because "while jurisdictional in nature, [it] has a statutory provenance" (internal quotation marks omitted)); *Marquez-Almanzar v. INS*, 418 F.3d 210, 216 n.7 (2d Cir. 2005) ("The jurisdictional prerequisites to our consideration of the merits in this case are imposed by statute, not the Constitution, and thus are not a bar to our assumption of 'hypothetical jurisdiction' where, as here, the jurisdictional issues are complex and the substance of the claim is plainly without merit."); *Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd.*, 325 F.3d 54, 59 (1st Cir. 2003) ("[W]hile Article III jurisdictional disputes are subject to *Steel Co.*, statutory jurisdictional disputes are not."); *Lukowski v. INS*, 279 F.3d 644, 647 n.1 (8th Cir. 2002) ("We clearly have Article III jurisdiction to review the BIA's decision, so this is not the type of jurisdictional issue that must be decided before addressing the merits of the controversy."); *Ramtulla v. Ashcroft*, 301 F.3d 202, 203 (4th Cir. 2002) (assuming jurisdiction under 8 U.S.C. § 1252(a)(2)(C)), *cert. denied*, 539 U.S. 927 (2003); *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 663 n.4 (7th Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999). We have reached a similar conclusion in the context of statutory standing. *Montague v. NLRB*, 698 F.3d 307, 313 (6th Cir. 2012) ("Unlike Article III standing, which ordinarily should be determined before reaching the merits, statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action." (quoting *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006))).

In this instance, the jurisdictional question concerns the proper scope of § 1252(a)(2)(C), and so has "a statutory provenance." *Jordon*, 424 F.3d at 325 n.8; *accord Minesen Co.*, 671 F.3d at 1337. Nor is there any doubt that we have Article III jurisdiction to hear Abou Khodr's case. Accordingly, we are not required to resolve the statutory-interpretation question, because we

## C. Legal Challenge

Abou Khodr argues that the IJ erred by failing to evaluate Abou Khodr's credibility according to the appropriate standard—namely, that the IJ failed to base her credibility determination on the "totality of the circumstances." 8 U.S.C. § 1158(b)(1)(B)(iii). In particular, Abou Khodr argues that "the IJ did not consider [Abou Khodr's] demeanor, the consistency of his written and oral statements with each other and with the testimony and statements of other witnesses, the internal consistency of each statement made, or the consistency of such statements with other evidence in the record." Pet'r's Br. at 21 (identifying factors enumerated in § 1158(b)(1)(B)(iii)).

We note that Abou Khodr's argument misidentifies the appropriate agency determination for us to review. We review the BIA's separate order, not the IJ's oral decision, "as the final agency determination." *Khalili*, 557 F.3d at 435. In this instance, the BIA identified and applied the correct legal standard, as provided by 8 C.F.R. § 1003.1. "Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed [by the BIA] only to determine whether the findings of the immigration judge are clearly erroneous." § 1003.1(d)(3)(i). The BIA noted its obligation to review the IJ's adverse-credibility finding for clear error. A.R. at 4 (BIA Op. at 2). The BIA then applied this standard and concluded that the IJ based her adverse-credibility finding on two reasons that were supported by the record: an adverse inference drawn against Abou Khodr for "refus[ing] to answer questions about his activities in drug trafficking and his conviction," and Abou Khodr's characterization of his participation in the drug conspiracy as "peripheral" in the face of evidence indicating his more serious involvement. *Id.* at 4–5 (BIA Op. at 2–3). Accordingly,

conclude that, assuming our power to review all of his claims, Abou Khodr's petition is nevertheless without merit.

10

the BIA did not commit legal error when it reviewed the IJ's adverse-credibility finding for clear error.

### D. Constitutional Challenge

Abou Khodr argues separately that the IJ's adverse-credibility finding violated Abou Khodr's constitutional rights. A resident alien may assert his privilege under the Self-Incrimination Clause if he can "demonstrate that any testimony he might give in the deportation investigation could be used in a criminal proceeding against him." *United States v. Balsys*, 524 U.S. 666, 671–72 (1998). Abou Khodr acknowledges that, in the context of an immigration proceeding, a court may in response draw an adverse inference against an alien who asserts his privilege. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1043–44 (1984). However, he argues that in this instance the IJ's adverse-credibility finding amounted to an unconstitutional penalty because "the IJ used [Abou Khodr's] exercise of his Fifth Amendment right, *without the benefit of any other evidence*, to entirely negate his credibility." Pet'r's Br. at 25 (emphasis added); *cf. Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (suggesting that an adverse inference is impermissible if it "smack[s] of an invalid attempt by the State to . . . *penalize* the exercise of the privilege" (emphasis added)).

Again, we review the BIA's separate opinion as the final agency determination. The BIA rejected the factual basis underlying Abou Khodr's constitutional challenge; it properly concluded that the IJ did not base her adverse-credibility finding solely on Abou Khodr's refusal to give testimony during his immigration proceedings. As the BIA correctly explained, the IJ additionally found that evidence in the record belied Abou Khodr's description of his level of participation in the conspiracy. A.R. at 5 (BIA Op. at 3); *see also* A.R. at 210–11 (IJ Oral Dec. at 59–60). Because Abou Khodr's argument depends on an inaccurate description of the IJ's reasoning, and because

11

Abou Khodr does not address or rebut the BIA's explanation, Abou Khodr has failed to establish the factual predicate motivating his Fifth Amendment challenge. Accordingly, we have no occasion to consider whether a constitutional violation occurred.

### E. Factual Challenge

Finally, substantial evidence supports the findings both that he was not credible and that his testimony, combined with Gabbay's expert testimony, did not establish Abou Khodr's entitlement to CAT protection. First, a reasonable adjudicator would not be compelled to conclude that Abou Khodr testified credibly. Abou Khodr testified that, as a member of the conspiracy, he had only "passed telephone numbers" between third parties. *See* A.R. at 399 (Removal Hr'g Tr. at 171). However, as both the BIA and IJ noted, this assertion is inconsistent with other evidence in the record. Abou Khodr pleaded guilty to participating in a conspiracy to possess with intent to distribute and to distribute at least 100 grams of heroin. A.R. at 851–52 (Rule 11 Plea Agreement at 1–2); A.R. at 891 (PSR at 13) (categorizing Abou Khodr as one of the "Suppliers/Distributors" in the conspiracy). Moreover, Abou Khodr's testimony demonstrated that he understood the conspiracy's particular method of distribution; knew personally Hamdar, a major Lebanese distributor in the conspiracy; and was considered sufficiently trustworthy by Hamdar to arrange three unrelated transactions. Finally, beyond his assertion that he only passed phone numbers, Abou Khodr refused to testify about the details of his participation in the drug conspiracy, leaving the IJ to draw an adverse inference regarding the level of Abou Khodr's participation. *See Lopez-Mendoza*, 468 U.S. at 1043–44. In light of this evidence, a reasonable adjudicator would not be compelled to conclude that Abou Khodr's limited assurances of his minor involvement in the conspiracy were credible.

12

Likewise, a reasonable adjudicator would not be compelled to conclude that Abou Khodr provided evidence establishing that it was more likely than not that upon returning to Lebanon he would suffer torture "inflicted by, instigated by, or done with the consent or acquiescence of a government official or someone acting in official capacity." *Ben Hamida*, 478 F.3d at 741. First, Abou Khodr did not offer evidence—other than his testimony, which had been found not to be credible—to support his suspicion that Hamdar could act with the consent or acquiescence of Lebanese officials. *See Dia v. Mukasey*, 292 F. App'x 468, 470 (6th Cir. 2008) ("CAT protection does not cover 'torture that occurs as a wholly private act.'" (quoting *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001))). Second, the BIA held that the persuasiveness of Gabbay's expert testimony was undermined insofar as it relied upon Abou Khodr's incredible description of his criminal involvement and subsequent government assistance. Third, the BIA concluded that Gabbay's testimony had its own shortcomings. In particular, Gabbay's explanation of why Hezbollah had not targeted Abou Khodr's family members—either those living in Lebanon, or those living in the United States but visiting Lebanon—was in tension with various country reports prepared by the State Department. A reasonable adjudicator would not be compelled to conclude that the disagreement between Gabbay and the country reports would have to be resolved in favor of Gabbay's testimony. *See Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004) (noting that, in some circumstances, State Department "reports are generally the best source of information on conditions in foreign nations" (internal quotation marks omitted)). Accordingly, the BIA's conclusion that Abou Khodr did not establish that it was more likely than not that he would be tortured upon his return to Lebanon is supported by reasonable, substantial, and probative evidence.

13

## III.  CONCLUSION

For the foregoing reasons, we **DENY** Abou Khodr's petition.