KAREN NELSON MOORE, Circuit Judge,
concurring in the judgment.
Each of our sister circuits has held that the Fair Sentencing Act does not apply to *661 prisoners sentenced to the statutory minimum before the Act’s effective date. Majority Op. at 652 (collecting cases). The Sentencing Commission shares this view, though it has repeatedly asked Congress to extend the Act’s benefits to all prisoners serving sentences for crack-cocaine violations. See, e.g., Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences: Hearing Before S. Comm, on the Judiciary, 113th Cong. 9 (2013) (statement of Judge Patti B. Saris, Chair, U.S. Sentencing Comm’n). Nothing in the statute’s text leads me to conclude that these positions are in error. Petitioners’ arguments to the contrary are unconvincing, and therefore, I must concur in the majority’s judgment to affirm the district court. I write separately, however, to express several reservations.
I.
On June 3, 2013, Jarreous Blewitt completed his period of custodial imprisonment, and his eight-year term of supervised release began to run. The government, as a result, asks us to dismiss Jarreous Blewitt’s appeal as moot, but the majority sidesteps this motion. Instead, the majority proceeds directly to the merits because it has “no doubt” as to our “jurisdiction over one of the defendants in this consolidated appeal.... ” Majority Op. at 650 (citing Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 98, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); Norton v. Mathews, 427 U.S. 524, 531, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976)). I do not believe that Article III allows such a move, nor do I think the Supreme Court encourages us to take such a step.
A.
The Constitution allows “federal courts [to] adjudicate only actual, ongoing cases or controversies.” Lewis v. Cont’l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). Under Article III, we are “not empowered to decide moot questions or abstract propositions.” North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (internal quotation marks omitted). When — for whatever reason — the dispute discontinues or we are no longer able to grant meaningful relief to the prevailing party, the action is moot, and we must dismiss for lack of jurisdiction. Knox v. Serv. Emp. Int’l Union, — U.S. -, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012). This is not a small or purely academic matter given that the “constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers_” Steel Co., 523 U.S. at 101,118 S.Ct. 1003.
The majority cites Steel Co. for the proposition that a federal court may reach the merits of a case — regardless of justici-ability concerns — as long as the court holds that it has jurisdiction over one of the companion cases. Majority Op. at 649-50. In its hurry to reach the merits, however, the majority misses the main thrust of Steel Co., and in doing so, it puts this court in direct conflict with the Supreme Court, our sister circuits, and scholars. In Steel Co., Justice Scalia’s majority explicitly rejected the doctrine of “hypothetical jurisdiction” — the practice of assuming jurisdiction when the merits provide a quicker and easier answer. 523 U.S. at 101, 118 S.Ct. 1003 (“Hypothetical jurisdiction produces nothing more than a hypothetical judgment — which comes to the same thing as an advisory opinion-”). As a result, the lower courts, including this one, have recognized that a federal court must satisfy itself of its jurisdiction, no matter how difficult, before reaching the merits of a case. See, e.g., Am. Civil Liberties Union v. Nat’l Sec. *662 Agency, 493 F.3d 644, 651-52 (6th Cir. 2007); In re LimitNone, LLC, 551 F.3d 572, 576 (7th Cir.2008); Valdez v. Allstate Ins. Co., 372 F.3d 1115, 1116 (9th Cir. 2004); see also Wright, Miller & Cooper, Federal Practice and Procedure § 3533.1 (2008) (“[T]he Supreme Court appears to have ruled that a court may never bypass a difficult and important Article III [justi-ciability] question in favor of resolving an easy and nonprecedential question on the merits.”). It is unclear how assuming that we have jurisdiction over Jarreous Blewitt because we are empowered to act in Cornelius Blewett’s case is anything but hypothetical jurisdiction.
Despite the strong, categorical language in Steel Co., that case did recognize that “the absolute purity of the rule that Article III jurisdiction is always an antecedent question” had been “diluted” by previous cases. Steel Co., 523 U.S. at 101, 118 S.Ct. 1003. One of those cases was Norton, cited by the majority, in which the Court refused to address whether a three-judge district court had jurisdiction in the proceedings below because “the case alternatively could be resolved on the merits in favor of the same party.” Norton, 427 U.S. at 532, 96 S.Ct. 2771. Because “the merits ha[d] been rendered plainly insubstantial” in a companion case, id., the Norton court avoided the “difficult and perhaps close jurisdictional arguments,” id. at 530, 96 S.Ct. 2771. Subsequent courts have interpreted the Steel Co. majority’s choice to distinguish, rather than overrule, Norton as license to create exceptions to the general rule.[1] Perhaps, by citing Steel Co. and Norton, the majority here aims to take advantage of these safety valves. However, neither of the recognized exceptions is applicable here.
First, on occasion, we have joined other circuits in “permit[ting] courts to assume that statutory jurisdiction — as distinct from constitutional jurisdiction — exists in order to resolve a case, by means of a straightforward merits analysis, in favor of the party contesting jurisdiction.” Khodr v. Holder, 531 Fed.Appx. 660, 665 n. 4 (6th Cir.2013); see also id. (collecting cases). This exception fits with Norton itself, which skipped over whether facts existed that would satisfy the statute that provided for the convening of a three-judge district court. Norton, 427 U.S. at 529-30, 96 S.Ct. 2771. It does not apply here, because the case and controversy requirements — including mootness — sound in Article III. See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Seros. (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); SEC v. Med. Comm. for Human Rights, 404 U.S. 403, 407, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); Rice, 404 U.S. at 246, 92 S.Ct. 402.
Second, other courts of appeals have recognized the slightly broader “foreordained exception.” See, e.g., Starkey v. Boulder Cnty. Soc. Servs., 569 F.3d 1244, 1261 (10th Cir.2009) (collecting cases). One of our sister circuits has read Steel Co. and Norton
to allow an exception to the rule against assuming the existence of standing in those “peculiar circumstances” where the outcome on the merits has been “foreordained” by another case such that “the jurisdictional question could have no effect on the outcome,” provided the court “d[oes] not use the pretermission of the jurisdictional question as a device for reaching a question of law *663 that otherwise would have gone unaddressed.”
Ctr. for Reprod. Law & Policy v. Bush, 304 F.3d 183, 194 (2d Cir.2002) (quoting Steel Co., 523 U.S. at 98, 118 S.Ct. 1003). Another circuit has similarly adopted this exception, but that court stressed that it avoids only “difficult question[s]” of jurisdiction, Seale v. INS, 323 F.3d 150, 157 (1st Cir.2003), and that it “does not create new precedent,” id. at 152. This case does not fit comfortably within such exceptions. Furthermore, whether we have jurisdiction in this case is relevant to many other 18 U.S.C. § 3582(c)(2) appeals. Thus, there is no reason to invoke this limited exception that has been recognized by only a few circuits. Instead, we should satisfy ourselves of our jurisdiction and address the government’s motion to dismiss.
B.
Under our general procedure and mootness principles, the government’s motion should nonetheless be denied. On prior occasions, we have stated that “ ‘[t]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.’ ” Ford v. Wilder, 469 F.3d 500, 504 (6th Cir.2006) (quoting McPherson v. Mich. High Sch. Athletic Ass’n, Inc., 119 F.3d 453, 458 (6th Cir.1997) (en banc)). Traditionally, once a prisoner finishes his sentence of imprisonment, any challenge to the term of imprisonment (as opposed to the underlying conviction) cannot make a difference absent a showing of collateral consequences. See Lane v. Williams, 455 U.S. 624, 631, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) (“Since respondents elected only to attack their sentences, and since those sentences expired during the course of these proceedings, this case is moot.”). Here, U.S.S.G. § 1B1.10(b)(2)(C) bars a district court from reducing a prisoner’s sentence below the term of imprisonment “already served,” which would seem to render Jar-reous Blewitt’s appeal moot. However, we have recognized that “an appeal is not entirely moot ‘so long as the appeal potentially implicates the length of the [defendant’s] supervised release term.’ ” United States v. Waltanen, 356 Fed.Appx. 848, 851 (6th Cir.2009)[2] (quoting United States *664 v. Maken, 510 F.3d 654, 656 n. 3 (6th Cir.2007)); see also United States v. May, 568 F.3d 597, 602 (6th Cir.2009); McClain v. Bureau of Prisons, 9 F.3d 503, 505 (6th Cir.1993). To take advantage of this exception, though, Jarreous Blewitt must demonstrate that a failure to grant him eligibility for a § 3582(c)(2) sentence reduction has collateral consequences for him. Demis v. Sniezek, 558 F.3d 508, 512 (6th Cir.2009); see also Spencer v. Kemna, 523 U.S. 1, 14, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).
In his response to the government’s motion to dismiss, Jarreous Blewitt argues that a favorable outcome in this appeal could impact a district court’s calculus when determining whether to modify or terminate his term of supervised release. Jarreous Blewitt Resp. at 2. I agree. In United States v. Johnson, 529 U.S. 53, 60, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000), the Supreme Court held that terms of imprisonment and of supervised release are not “interchangeable,” but “equitable considerations of great weight exist when an individual is incarcerated beyond the proper expiration of his prison term,” which could impact a district court’s § 3583 analysis. In circumstances similar to Jarreous Blewitt’s, the D.C. Circuit has stated, “eligibility] for a reduced sentence under § 3582(c)(2), if it led to an actual sentence reduction, would necessarily inform the district court’s evaluation of a motion for termination or reduction of [a] term of supervised release under § 3583(e)(1) or (e)(2).” United States v. Epps, 707 F.3d 337, 345 (D.C.Cir.2013); see also Levine v. Apker, 455 F.3d 71, 77 (2d Cir.2006); Mu-jahid v. Daniels, 413 F.3d 991, 994-95 (9th Cir.2005). Here, Jarreous Blewitt cannot receive an actual reduction of his imprisonment term because U.S.S.G. § 1B1.10(b)(2)(C) precludes a district court from reducing a term of imprisonment below time “already served.” The Sentencing Guidelines, however, direct district courts to “consider any such reduction that it was unable to grant [as a result of § 1B1.10(b)(2)(C) ] in connection with any motion for early termination of a term of supervised release under 18 U.S.C. § 3583(e)(1).” U.S.S.G. § 1B1.10 cmt. n. 5(B). Therefore, a holding that Jarreous Blewitt is eligible for a § 3582(c)(2) sentence reduction renders a modification or termination of supervised release more likely, and thus, his appeal is not moot.
II.
Regrettably, the Fair Sentencing Act— as written — does not benefit prisoners, like the petitioners, who were sentenced to the crack-cocaine mandatory mínimums before the Act’s effective date. The statute is silent as to its retroactive application, and statements of individual members of Congress, though eloquent and compassionate, cannot trump or supplement the text of the Act, which was passed by both houses of Congress and signed into law by the President. Thus, the general savings statute, 1 U.S.C. § 109, resolves this silence in favor of purely prospective application.
III.
Petitioners challenge the district court’s denial of a sentence reduction under 18 *665 U.S.C. § 3582(c)(2). Normally, federal courts cannot disturb or recalculate a prisoner’s sentence once it is finally imposed, § 3582(b), but “[s]ection 3582(c)(2) establishes an exception to the general rule of finality....” Dillon v. United States, 560 U.S. 817, 130 S.Ct. 2683, 2690, 177 L.Ed.2d 271 (2010). The Supreme Court has further stated that it is “aware of no constitutional requirement of retroactivity that entitles defendants sentenced to a term of imprisonment to the benefit of subsequent Guidelines amendments.” Id. at 2692. Rather, § 3582(c)(2) is merely “a congressional act of lenity.” Id. Congress can always broaden this statutory right, or it can establish neutral roadblocks that result in the denial of relief to certain types of prisoners. Currently, to be eligible for § 3582(c)(2) relief, a prisoner must show: (1) that the Sentencing Commission amended a guideline range and made that amendment retroactive, see § 3582(c)(2); (2) that his sentence was “based on” the guideline range amended by the Sentencing Commission, id.; Freeman v. United States, — U.S. -, 131 S.Ct. 2685, 2692-93, 180 L.Ed.2d 519 (2011) (plurality opinion); and (3) that the application of the new guideline range would actually “have the effect of lowering the defendant’s applicable guideline range,” U.S.S.G. § 1B1.10(a)(2)(B).
Petitioners here satisfy the first two requirements, but they cannot clear the final hurdle to eligibility. The new guidelines do not have the effect of lowering petitioners’ applicable guideline range because the new mandatory mínimums are not retroactive. The old mandatory mínimums, like other statutory mínimums, continue to block relief. Given that there is no constitutional right to a sentence reduction and that Congress could abolish § 3582(c)(2) completely, I cannot say that Congress’s choice to limit relief under § 3582(c)(2) to prisoners not subject to mandatory minimums presents a constitutional problem. Cf. Lindh v. Murphy, 96 F.3d 856, 872 (7th Cir.1996) (justifying 28 U.S.C. § 2254(d)’s limitation of federal habeas review on similar logic), rev’d on other grounds, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).
Importantly, under § 3582(c)(2), prisoners can seek only a sentence modification, and we can decide only whether they are eligible for a reduction. Petitioners cannot challenge the legality of their sentences or the sentencing courts’ original calculations of the sentencing guidelines. Dillon, 130 S.Ct. at 2694. The power and discretion of the federal courts, as well as our scope of review, are similarly constrained under § 3582(c)(2). Dillon, 130 S.Ct. at 2691; United States v. Washington, 584 F.3d 693, 694 (6th Cir.2009). As a result, the constitutionality of Cornelius Blewett’s and Jarreous Blewitt’s sentences is not before us today. But let there be no mistake: if a prisoner, who is serving a sentence based on the old mandatory mínimums, challenged his sentence under 28 U.S.C. §§ 2241 or 2255, we could address the constitutional question directly.[3] Two decades ago, we held that sentences imposed pursuant to the 100-to-l ratio did not violate the Fifth or the Eighth Amendments. See United States v. Williams, 962 F.2d 1218, 1227-28 (6th Cir.1992) (Equal Protection); United States v. Levy, 904 F.2d 1026, 1034 (6th Cir.1990) (Eighth Amendment). For the reasons stated below, I lack faith in the soundness of those decisions.
*666 A. Equal Protection
The federal government may not “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const. amend. XIV, § 1; Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 698, 98 L.Ed. 884 (1954) (applying the Fourteenth Amendment’s commands to the federal government through the Fifth Amendment). At one point, these blunt words meant “ ‘that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; ... that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offenses.’ ” Yick Wo v. Hopkins, 118 U.S. 356, 367-68, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (quoting Barbier v. Connolly, 113 U.S. 27, 31, 5 S.Ct. 357, 28 L.Ed. 923 (1884)). Today, this fundamental protection prevents the federal government from enforcing its laws in a racially discriminatory manner or maintaining statutes that are no longer rationally related to a legitimate end.
“Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice,” because it “destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process.” Rose v. Mitchell, 443 U.S. 545, 555-56, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Such discrimination “not only violates our Constitution,” but also “is at war with our basic concepts of a democratic society and a representative government.” Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940) (footnote omitted). In 2012, 82.6 percent of convicted federal crack-cocaine defendants were African American, yet African Americans represent only one-third of crack-cocaine users in the United States. U.S. Sentencing Comm’n, Sourcebook of Federal Sentencing Statistics 103 tbl. 34 (2012); H.R.Rep. No. 111-670, at 4 (2010) (citing Substance Abuse & Mental Health Servs. Admin., Results from the 2005 National Survey on Drug Use and Health: Detailed Table J, tbl. 1.43a (Sept.2006)). In the same time-frame, only 6.7 percent of convicted federal crack-cocaine defendants were Caucasian, despite the fact that the majority of users is white. U.S. Sentencing Comm’n, Sourcebook, at 103 tbl. 34. No conception of equality, no decent government, can long tolerate a criminal-justice system in which its citizens are treated so differently if such treatment is based on the color of their skin.
On its face, the 100-to-1 ratio is not a racial classification, and thus, proof of disparate impact is not enough. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Supreme Court also requires a demonstration that the discriminatory enforcement of the law is motivated by a discriminatory purpose, McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), that the government “selected or reaffirmed a particular course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group,” Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In most cases, satisfying this standard requires particularized proof of motive, see, e.g., United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), yet “[s]ome-times a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.” Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. In those rare situations, *667 “[t]he evidentiary inquiry is then relatively easy.” Id.
The federal government’s enforcement of the crack-cocaine laws is stark and wildly disproportionate in its effects. Since Congress created the 100-to-l ratio in 1986, African Americans have constituted eighty to ninety-five percent of federal crack-cocaine defendants while continuing to be a minority of crack-cocaine users. See, e.g., U.S. Sentencing Comm’n, Source-book, at 103 tbl. 34; David A. Sklansky, Cocaine, Race, and Equal Protection, 47 Stan. L.Rev. 1283, 1289 (1995) (citing U.S. Sentencing Comm’n, Annual Report 46, 88 (1992)). While the 100-to-l ratio was in effect, the average federal drug sentence for African Americans was forty-nine percent longer than the average federal drug sentence for Caucasians. Barbara S. Meierhoefer, Fed. Judicial Ctr., The General Effect of Mandatory Minimum Prison Terms 20 (1992) (reporting data as of 1990). The impact of this policy was, and is, felt beyond the prison walls.. See generally Michelle Alexander, The New Jim Crow 140-77 (rev. ed.2012). At minimum, these statistics begin to suggest a criminal-justice system that treats one race much harsher than others. If true, this cannot stand. “Our Constitution is color-blind, and neither knows nor tolerates classes among citizens.” Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). By burdening one race above all others, the enforcement of the 100-to-l ratio has potentially offended the Constitution’s basic guarantee of equal treatment.
Even if the current binding constitutional doctrine does not allow the application of strict-scrutiny analysis, the 100-to-l ratio must still survive rational-basis review to remain valid. Supreme Court precedent teaches that “if a law neither burdens a fundamental right nor targets a suspect class, we [must] uphold the legislative classification so long as it bears a rational relation to some legitimate end.” Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). “[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.” City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). When faced with “ ‘[discriminations of an unusual character,’” however, we must provide “careful consideration.” United States v. Windsor, — U.S.-, 133 S.Ct. 2675, 2693, 186 L.Ed.2d 808 (2013) (quoting Romer, 517 U.S. at 633, 116 S.Ct. 1620).
In Williams, this circuit in 1992 upheld the 100-to-l ratio against a generic rational-basis challenge because Congress then believed that (1) crack cocaine is pharma-cologically different than powder cocaine and (2) the effects of crack-cocaine trafficking are more extreme. 962 F.2d at 1227. These assumptions underlying the 100-to-l ratio may have been rational and constitutional in 1986 or 1996, “but history makes clear that constitutional principles of equality, like constitutional principles of liberty, property, and due process, evolve over time; what once was a ‘natural’ and ‘self-evident’ ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom.” Cleburne, 473 U.S. at 466, 105 S.Ct. 3249 (Marshall, J., concurring and dissenting in part). Moreover, “[s]hifting cultural, political, and social patterns at times come to make past practices appear inconsistent with fundamental principles upon which American society rests, an inconsistency legally cognizable under the Equal Protection Clause.” Id.
The experience of the past quarter-century has drawn the rationality of the 100-to-l ratio into question. As my dissenting *668 colleagues explain, the validity of the Congress’s original assumptions may not survive careful consideration today. See Cole, J., dissenting at 672-73; Clay, J., dissenting at 674-79; see also United States v. Smith, 73 F.3d 1414, 1418-22 (6th Cir. 1996) (Jones, J., concurring). Furthermore, rather than protecting our citizens, the law has led to the mass incarceration of African-American men and has bred distrust of law enforcement in the larger African-American community. It is time that the federal judiciary determines again whether the Constitution abides such actions.
B. Eighth Amendment
The Eighth Amendment provides that “[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” While these words may be imprecise, the Supreme Court has held that the “Amendment contains a ‘narrow proportionality principle,’ that ‘does not require strict proportionality between crime and sentence’ but rather ‘forbids only extreme sentences that are grossly disproportionate to the crime.’ ” Graham v. Florida, 660 U.S. 48, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010) (quoting Harmelin v. Michigan, 501 U.S. 957, 997, 1000-01, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring)). When considering whether a sentence is grossly disproportionate, we are largely “guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.” Solem v. Helm, 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). But in addition, we must remember that “[t]he Amendment ... draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society.” Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion).
In Levy, United States v. Avant, 907 F.2d 623 (6th Cir.1990), and United States v. Pickett, 941 F.2d 411 (6th Cir.1991), we upheld the 100-to-l ratio against Eighth Amendment challenges. A panel noted in Levy — without much explanation — that “[a] ten-year sentence for drug possession simply does not approach the same level of gross inequity” that had previously been held unconstitutional. 904 F.2d at 1034 (quoting United States v. Cyrus, 890 F.2d 1245, 1248 (D.C.Cir.1989)). In Avant, a panel stated that a ten-year sentence for possessing 7.3 grams of crack cocaine was “severe,” but nonetheless constitutional. 907 F.2d at 627.
In the past two decades, however, new information and events have cast doubt upon the continued validity of those decisions. Congress has passed the Fair Sentencing Act, lowering the disparity between crack and powder cocaine. The Sentencing Commission has, in turn, lowered the guidelines for crack cocaine. As of 2007, “[o]nly 13 states ha[d] some form of distinction between crack cocaine and powder cocaine,” none of which employed a 100-to-1 ratio or worse. U.S. Sentencing Comm’n, Report to the Congress: Cocaine and Federal Sentencing Policy 98-104 (2007). Since then, Missouri has lowered its ratio from 75-to-l down to 18.75-to — 1. Compare Mo.Rev.Stat. § 195.222(2) (2011) with Mo.Rev.Stat. § 195.222(2) (2013). Now, only Missouri, Arizona (12-to — 1), and New Hampshire (28-to-l) have ratios above 10-to-l. See Ariz.Rev.Stat. §§ 13-3408(A)(2), (B)(2); 13-3401(36)(b), (c); N.H.Rev.Stat. § 318-B:26(I)(a)(1), (3). In short, no American jurisdiction today treats crack-cocaine offenders in such a disproportionate way as the federal government did prior to the Fair Sentencing *669 Act. These changes, particularly when considered in conjunction with the new information discussed above in Section 111(A) of this opinion and in the dissents, suggest that the mandatory mínimums in force before the enactment of the Fair Sentencing Act now constitute grossly disproportionate punishment. At the very least, we should reconsider whether Levy and its progeny still remain good law.
The majority cites Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and Harmelin to show the limits of our Constitution. It might as well add Armstrong and McCleskey to its parade of horribles. I do not concede that these cases foreclose a challenge to the 100-to-l ratio today, nor do I believe that mistakes should be repeated and relied upon to shrink further our constitutional protections. History and experience can reveal that our past decisions were wrong, and thankfully we are not forever bound by a cramped reading of our charter of government. Still, I am mindful that “[i]t is not for our court, as an inferior one, to give full expression to any personal inclination any of us might have and to take the lead in expanding constitutional precepts when we are faced with a limiting Supreme Court decision which, so far as we are told directly, remains good law.” Jones v. Alfred H. Mayer Co., 379 F.2d 33, 43 (8th Cir.1967) (Blackmun, J.), rev’d, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). If the 100-to-l ratio remains constitutional under those decisions, I will apply them and remain faithful to my oath. But I nonetheless look forward to a day when our law reflects the full promise of our Constitution and our sentencing policy is more colorblind, more compassionate, and more fair.
For the reasons stated above, I concur in the judgment.

. Five justices did agree that exceptional circumstances might warrant the assumption of statutory jurisdiction. See Steel Co., 523 U.S. at 110, 118 S.Ct. 1003 (O’Connor, J., joined by Kennedy, J., concurring); id. at 111, 118 S.Ct. 1003 (Breyer, J., concurring); id. at 112, 118 S.Ct. 1003 (Stevens, J., joined by Souter, J., concurring in the judgment).

. In Waltanen, a panel dismissed a prisoner’s appeal as moot, in part, because he “did not move the district court to reconsider his supervised release term.” 356 Fed.Appx. at 851; see also United States v. Bravo, 362 Fed. Appx. 456 (6th Cir.2010). Furthermore, the panel in Waltanen held that “any issue relating to early termination [of supervised release was] premature and not ripe for our consideration” because the prisoner had not been on supervised release for the one-year requirement embedded in 18 U.S.C. § 3583(e)(1). 356 Fed.Appx. at 852. In my view, both of these conclusions are in error.
First, requiring a prisoner to file a § 3583 motion, in circumstances such as these, is overly formalistic and blind to reality. When Jarreous Blewitt filed for § 3582(c)(2) relief in district court, his petition was timely. When he won on appeal, his § 3582(c)(2) petition still was timely. Only now, after the government has sought en banc review — approximately eighteen months after the district court first ruled — is the mootness of Jarreous Blewitt's motion in question. To say that Jarreous Blewitt cannot get relief now because he did not make a § 3583 filing in district court, at a time when such a motion would not have been ripe, makes little sense.
Second, a determination that a § 3583(e)(1) motion would not be ripe until a prisoner has served one year of his term — is incorrect and unwise. Section 3583(e)(1) states that a court may terminate supervised release "any time after the expiration of one year of supervised release,” but it is silent as to when a prisoner may file for relief. Requiring a prisoner to wait until one year of supervised release has passed to file a § 3583 petition would essentially tack on extra time and defeat the congressional judgment that a district court should have discretion to terminate supervised release after the first year has been served. See United States v. Epps, 707 F.3d 337, 344 (D.C.Cir.2013). Such a requirement does not fit with the text of § 3583, and *664 therefore, I would not support a decision imposing such a judicial amendment to the statute. Furthermore, § 3583(e)(2) allows a district court to "modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release....” Id. (emphasis added); see also United States v. Shultz, 733 F.3d 616, 622 (6th Cir.2013) (noting that a defendant could seek a modification whenever the need arose). Therefore, a district court could proceed under § 3583(e)(2) in the alternative, even if this court chose unwisely to overread § 3583(e)(1).

. The petitioners neither ask us to construe their § 3582(c)(2) motions as applications for habeas relief nor challenge the constitutionality of their sentences. Thus, we cannot rule on the question now.