RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0111p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

―――――――――――

JOSE VENTURA-REYES,

     *Petitioner,*

 *v.*

No. 14-3237

LORETTA E. LYNCH, Attorney General,

     *Respondent.*

―――――――――――

On Petition for Review of an Order
of the Board of Immigration Appeals
No. A044479514.

Argued: January 20, 2015

Decided and Filed: May 26, 2015[*]

Before: MERRITT, STRANCH, and DONALD, Circuit Judges.

―――――――――――

**COUNSEL**

**ARGUED:** Jason T. Lorenzon, LORENZON LAW, LLC, Independence, Ohio, for Petitioner. Victor M. Lawrence, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jason T. Lorenzon, LORENZON LAW, LLC, Independence, Ohio, for Petitioner. Victor M. Lawrence, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

―――――――――――

**OPINION**

―――――――――――

  BERNICE BOUIE DONALD, Circuit Judge. Petitioner Jose Ventura-Reyes ("Ventura-Reyes") seeks judicial review of a final removal order of the Board of Immigration Appeals

―――――――――

[*]This decision was originally issued as an "unpublished decision" filed on May 26, 2015. The court has now designated the opinion as one recommended for full-text publication.

1

("BIA"). That order dismissed his appeal of an Immigration Judge's ("IJ's") order denying his application for deferral from removal under the United Nations Convention Against Torture ("CAT"). For the reasons stated herein, we **DENY** the petition in part and **DISMISS** the remainder for lack of jurisdiction.

I.

Ventura-Reyes, a citizen of the Dominican Republic, first entered the United States through Puerto Rico on or around December 28, 1989, and obtained lawful permanent residence on March 3, 1994. On October 6, 2011, Ventura-Reyes was convicted of attempted possession and conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. On October 9, 2012, a Notice to Appear was issued stating Ventura-Reyes was removable on the basis of his criminal convictions. Ventura-Reyes pursued his only available option for relief—deferral of removal under the CAT—based on alleged fear of torture upon removal to the Dominican Republic. *See* 8 C.F.R. §§ 1208.17(a), 1208.18(a)(1).

Ventura-Reyes' fear of torture upon removal stems from two claims: (1) a politically influential Dominican family allegedly believes that he is responsible for the murder of their patriarch, Julian Peguero Rojas (aka "Chito" or "Peguero") on September 25, 1989, in the Dominican Republic; and (2) Ventura-Reyes was an informant for the U.S. Drug Enforcement Administration ("DEA"), allegedly resulting in the arrests of members of the drug-trafficking Gonzalez Molina family, which seeks revenge against him. We discuss the facts concerning each claim separately below.

A.

Ventura-Reyes' first claim arose on or around September 24, 1989, which was election day in his hometown of Angelina Cotue[1] in the Dominican Republic. Ventura-Reyes' politically-active aunt, Anadalia Almanza Reyes became embroiled in a physical altercation over alleged voter fraud with Vicente Varet, Eujenio Montilla, and Lucito Peguero, who were members or affiliates of the Peguero family, and belonged to a rival political party. On September 25, 1989, Lucito Peguero and his cousin—who lived on the same street as Anadalia

---

[1]Angelina Cotue, also spelled "Angelina Cotui," appears to be the same as "Cotui." A.R. 512.

Almanza Reyes—became drunk and allegedly went to her house and attempted to kill her. A friend informed Ventura-Reyes—who was elsewhere at the time—of the attack. Ventura-Reyes went directly to his aunt's home. Arriving at the same time as his uncle, Rafael Almanza Reyes, Ventura-Reyes found his aunt wounded and learned what happened. At some point, several more members or affiliates of the Peguero family arrived and attacked the Reyes family, including Ventura-Reyes, his aunt, his uncle, and his cousin. When the fight moved outdoors to the front yard, Rafael Almanza Reyes, who had a gun, fired several shots into the air. When the Pegueros saw he had a gun, they attempted to wrest it from him. Ventura-Reyes testified before the IJ that a Peguero family member attacked Rafael Almanza Reyes with a machete. Rafael Almanza Reyes attempted to shoot his assailant but instead shot and killed Julian Peguero Rojas, the patriarch of the Peguero family. Julian Peguero Rojas' family then attacked Rafael Almanza Reyes and tried to take the gun from him. Pursued by various members of the Peguero family, Rafael Almanza Reyes gave the gun to Ventura-Reyes. When the Peguero family saw Ventura-Reyes with the gun, they turned their attention to him. Ventura-Reyes was hit in the knee and knocked forward. He tried to shoot the gun, but it was out of bullets.

The fight eventually ceased when two armed state agents (either police or national guard) arrived on the scene to protect the Reyes family and Anadalia Almanza Reyes' house. Ventura-Reyes, along with his aunt, uncle, and a cousin, were taken to the hospital. Ventura-Reyes was released in five hours, after the wound to his knee was treated, but the rest of his family suffered more serious injuries and were hospitalized for several days. Ventura-Reyes was detained and questioned by police during their investigation into the death of Julian Peguero Rojas. Ventura-Reyes was ultimately released unharmed after 24 to 48 hours. Upon release from the hospital, Rafael Almanza Reyes was charged with the death of Julian Peguero Rojas, arrested, and taken to jail by police.

Ventura-Reyes alleges that the Peguero family blames him for the fatal shooting of Julian Peguero Rojas and are intent on kidnapping or killing him. Consequently, Ventura-Reyes went into hiding some distance from Angelina Cotue. With financial help from his father, Ventura-Reyes left his hide-out on November 27, 1989, and traveled to Lamisa La Meche—about 30-40 miles from the capital, Santo Domingo. Around December 24, 1989, Ventura-Reyes traveled by

boat with a group of more than 100 people to Yauco, Puerto Rico, arriving on December 28, 1989.**2** Ventura-Reyes left Puerto Rico on March 16, 1990, to join his wife**3** and uncles, who were living in New York. On March 3, 1994, Ventura-Reyes obtained lawful permanent residence in the United States through his wife.

Since his arrival in the United States, Ventura-Reyes has returned to the Dominican Republic several times, including a 20-day trip in 1994, a subsequent visit to see his ailing father and to "recognize" his extra-marital daughter, and most recently in 2002 to accompany his wife who sought medical treatment from Dominican doctors. Ventura-Reyes testified that he has not returned to Angelina Cotue and that he has never been harmed on his trips to the Dominican Republic. However, he was informed by a relative during his last visit that some men in Angelina Cotue were inquiring about him and that a Peguero family associate was searching for him. As a result, Ventura-Reyes cut his visit short and returned to the United States before his wife completed her medical treatment.

Ventura-Reyes' wife has returned to the Dominican Republic for further surgical treatment, as recently as 2005 or 2006. Ventura-Reyes also has seven children, five of whom were born in the United States and two of whom were born in the Dominican Republic. Only one daughter lives in the Dominican Republic; her exact whereabouts are uncertain, but to Ventura-Reyes' knowledge, she has not been harmed. His American-born children have traveled to the Dominican Republic, including as recently as 2009 or 2010. Ventura-Reyes continues to believe that the Peguero family is a threat to him because "they said they were going to join the police force to kill [him]" and they swore to avenge the death of Julian Peguero Rojas. A.R. 321-22.

## B.

Ventura-Reyes' second claim arose in 1997 when Ventura-Reyes' uncle, Radame Almanza Reyes, was arrested for selling 62 grams of heroin to a DEA informant in New York. Ventura-Reyes alleges that Radame Almanza Reyes pled guilty, agreed to cooperate with the

---

**2** Ventura-Reyes' application for relief indicates December 24, 1990, but this appears to be in error, and the December 28, 1989, date is credited by the BIA and IJ.

**3**Ventura-Reyes testified that his wife, whom he married in 1988, had immigrated to the United States in 1987.

government, and consequently received five years of probation instead of a prison sentence.[4] Ventura-Reyes accompanied another uncle, Anibal Reyes, to post bond for Radame Almanza Reyes. At that time, Ventura-Reyes may have suggested additional family members (specifically, his cousin, Rafael Antonio Reyes) who could assist the DEA in their efforts to identify other drug dealers. This appears to be the extent of Ventura-Reyes' own actions with respect to the DEA.

The DEA enlisted Ventura-Reyes' relatives, Radame Almanza Reyes and possibly Rafael Antonio Reyes (who appeared to have pre-existing connections to the drug world), to stage a drug deal at a location near 163rd Street in Manhattan.[5] The staged drug deal led to some arrests by the DEA. Modesto Gonzalez Molina, a dealer who allegedly lost money when the arrests were made, sought revenge against Rafael Antonio Reyes and staged a robbery to steal the proceeds from the sale of two kilos of cocaine (unconnected to the DEA-staged deal) in 1999. On December 1, 2002, in the Dominican Republic, the bad blood between Modesto Gonzalez Molina and Rafael Antonio Reyes culminated in the deaths of Modesto Gonzalez Molina and his brother (Juan Vermen Gonzalez Molina) at the hands of Rafael Antonio Reyes. Ventura-Reyes believes that Rafael Antonio Reyes was acting in self-defense, as the Gonzalez Molina brothers had been seeking revenge against him for the New York drug incidents. Rafael Antonio Reyes was charged for the deaths of the Gonzalez Molina brothers in 2002. In 2003, he was convicted and sentenced to twenty years' imprisonment in the Dominican Republic. Ventura-Reyes testified before the IJ that Rafael Antonio Reyes was released after serving only two years because he appealed his case with the help of lawyers and a former girlfriend of Modesto Gonzalez Molina, who testified on his behalf. Subsequently, in 2005, the witness allegedly was killed by the Dominican military, which was believed, "by neighbors and other people" who supposedly saw the incident, to be connected to the Gonzalez Molina family and the Bronx drug arrests. A.R. 274. On June or July 8, 2005, upon Rafael Antonio Reyes' release from prison, he was involved in a car chase and shootout during which a close family friend, Fermin/Vermen

---

[4]However, there is no proof in the record that Radame Almanza Reyes was convicted or entered a plea agreement.

[5]Ventura-Reyes testified that he previously witnessed a drug deal at the same location in the Bronx when he was sent to collect rent money from a drug dealer on behalf of a tenant who was renting an apartment from Ventura-Reyes. Ventura-Reyes did not reveal what he witnessed to anyone. However, Ventura-Reyes' cousin, Rafael Antonio Reyes, was independently aware of the drug dealing at that location.

Soto, was killed.  The car used in the chase was stolen but may have been registered in the name of someone with ties to Dominican police or military possible connections to the Gonzalez Molina family; in any case, Ventura-Reyes testified that, after the shootout, the car and papers related to the investigation both disappeared and the investigation was closed, possibly due to the car's ownership.

On or around September 3, 2012 Rafael Antonio Reyes was killed, allegedly by the Gonzalez Molina family.  In addition to Fermin/Vermen Soto and Rafael Antonio Reyes, Ventura-Reyes testified that other family members were also killed in the Dominican Republic since the Gonzalez Molina brothers' deaths in 2002.[6]  The deaths occurred in or near Ventura-Reyes' hometown of Angelina Cotue and the nearby town of Las Guaranas, in a neighboring province.  No family members were harmed in the United States.  As a result, Ventura-Reyes believes that members of the Gonzalez Molina family involved in the 163rd Street drug ring know who he is, may have connections to the Dominican police and military, and have reason to exact revenge against him upon his removal to the Dominican Republic.

C.

On October 6, 2011, Ventura-Reyes was convicted of attempted possession and conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846.  On October 9, 2012, a Notice to Appear was issued stating Ventura-Reyes was removable on the basis of his criminal convictions.  Ventura-Reyes' removal proceedings involved a multi-day merits hearing, which began on June 18, 2013, and continued on June 28, 2013, August 21, 2013, and September 19, 2013.

During the proceedings, Ventura-Reyes offered his own testimony, the testimony of his New York-based uncle, Felipe Reyes, and extensive documentary evidence.[7]  On June 28, 2013, Felipe Reyes testified about the 1989 political conflict with the Peguero family and the murder of Julian Peguero Rojas in the Dominican Republic.  Though the witness list reflected that Felipe

---

[6]Notably, one of the deceased relatives named by Ventura-Reyes was his brother, Noel Ventura-Reyes, who was killed on July 26, 2012.  Noel Ventura-Reyes' death certificate states that he died from natural causes—a cardiac arrest, which Ventura-Reyes disputes based on rumors in his family.

[7]Having previously accepted Ventura-Reyes' last-minute filings, including lengthy affidavits filed less than a week before the first merits hearing, the IJ closed the documentary record on June 18, 2013, at the end of the first day of the merits hearing.  Ventura-Reyes raised no objections to the closing of the documentary record.

Reyes would speak from first-hand knowledge, Felipe Reyes was neither present nor even in the country at that time and based his testimony on what he understood to have occurred. Accordingly, the IJ found his testimony was entirely hearsay or multiple hearsay, which, while admissible, was neither reliable nor probative. The IJ also found Felipe Reyes' testimony to be inconsistent and lacking in credibility—in part because it contradicted Ventura-Reyes' own testimony, which the IJ found to be credible. For example, Ventura-Reyes testified that he left the Dominican Republic within four months of the 1989 killing of Julian Peguero Rojas, whereas Felipe Reyes testified that Ventura-Reyes left one-and-a-half or two years after the 1989 incident.

When Ventura-Reyes' third witness, Anadalia Almanza Reyes, was unable to testify due to health reasons on August 16, 2013, Ventura-Reyes filed an emergency "Motion to accept additional evidence due to health of witness" that he claimed he could not file earlier because of Anadalia Almanza Reyes' health. A.R. 448; 749. During the hearing on August 21, 2013, the IJ admitted only two of the five proffered documents. The IJ sustained the government's objection that the remaining documents were unrelated to and inexcusable by Anadalia Almanza Reyes' health and were available prior to the closing of the documentary record. Ventura-Reyes' counsel agreed that the two documents that were admitted satisfied the emergency motion. A.R. 448 ("And I think by admitting [two of the five documents] I've addressed your motion to accept additional evidence due to health of witness. . . . Correct? . . . . Yes, Your Honor.")

During closing arguments on August 21, 2013, Ventura-Reyes' counsel argued that, for the purpose of CAT protection, government acquiescence to torture can result regardless of "whether it's high-level or low-level officials," and "public officials . . . [are] not restricted to the upper tiers of government [and include] lower levels of government as well." A.R. 453-54 (citing *Marmorato v. Holder*, 376 F. App'x 380 (5th Cir. 2010) (per curiam)). The government argued that Ventura-Reyes' burden of proof is to "demonstrate that there's a clear probability that he will be tortured if he returns to the Dominican Republic, not that eventually he might get killed by people who apparently have some type of personal vendetta against his family for reasons that aren't necessarily particularly clear." A.R. 457.

On September 19, 2013, the IJ issued an oral decision finding that there was insufficient credible evidence in the record to support Ventura-Reyes' arguments that it is more likely than not that he would be tortured for his alleged involvement in the 1989 murder or his alleged role as a DEA informant, if removed to the Dominican Republic.

Specifically, the IJ held that Ventura-Reyes failed to meet his burden of proof because Ventura-Reyes (1) has returned to the Dominican Republic several times without harm; (2) was released unharmed after questioning following the Peguero murder and his uncle Rafael Almanza Reyes was convicted and jailed instead; (3) testified that police or national guard agents aided his aunt and protected her home after the 1989 attack by the Peguero family; (4) had only indirect contact with the DEA, which was limited to one instance; (5) has offered no corroborating documentary evidence to show that he was a DEA informant (and never explained why such evidence does not exist); and (6) offered no evidence, aside from his own speculations, conclusions, and assumptions (and those of Felipe Reyes), that Dominican police and law enforcement are connected with the Peguero and/or Molina Gonzalez families. The IJ issued an order for removal on September 19, 2013. The BIA affirmed and issued a final removal order on March 5, 2014. Ventura-Reyes filed a timely petition for review on March 20, 2014.

In his petition, Ventura-Reyes challenges: (1) the IJ's adverse-credibility finding with respect to Felipe Reyes; (2) the BIA's affirmance of the IJ's exclusion of three news articles as untimely documentary evidence; and (3) the BIA's analysis of what constitutes "acquiescence" to torture by a government "official" under 8 C.F.R. § 1208.18(a)(1). We examine each issue separately.

## II.

As a threshold matter, we note that because Ventura-Reyes' final order of removal is based on his criminal convictions, we may review his claims only insofar as they raise constitutional issues or questions of law. *Luambano v. Holder*, 565 F. App'x 410, 412 (6th Cir. 2014) (Merritt, Cook, Donald, JJ.) (holding, in a case where an alien was "removable by reason of having committed a criminal offense," that only constitutional claims or questions of law raised in a petition were reviewable); *Mendoza-Rodriguez v. Holder*, 564 F. App'x. 222, 223 (6th Cir. 2014) (per curiam) ("Because [petitioner] appeals from a final order of removal that is

based on his commission of a criminal offense under 8 U.S.C. § 1227(a)(2)(B)(i), our review is limited to constitutional claims and questions of law."). This is because Congress enacted a jurisdiction-stripping provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") Pub. L. No. 104-208, § 306, 110 Stat. 3009-546, 3009-607. This provision strips courts of "jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [a controlled substance offense]." 8 U.S.C. § 1252(a)(2)(C). The jurisdictional bar set forth in § 1252(a)(2)(C) is subject to an exception, articulated in subsection (D) of the same statute: "Nothing in subparagraph . . . (C) . . . shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." *Id.* § 1252(a)(2)(D).

Ventura-Reyes concedes that he is removable by reason of having committed a controlled substance offense and that subsections (C) and (D) of the statute apply to limit our review of his petition to constitutional claims or questions of law it raises. However, he nevertheless argues that we must also review the IJ's factual findings under the substantial-evidence standard. Pet'r's Br. at 25.

Ventura-Reyes does not acknowledge that the latter argument contradicts his concession. He also does not bring the latter argument as a jurisdictional challenge.[8] His argument nevertheless resonates with a second exception to subsection (C)'s jurisdictional bar that has been adopted by the Ninth Circuit: "The second exception permits our review when the IJ denies relief on the merits of the claim rather than in reliance on the conviction, *i.e.*, when the IJ concludes that the petitioner failed to establish the *requisite* grounds for relief." *Perez-Palafox v. Holder*, 744 F.3d 1138, 1144 (9th Cir. 2014); *see also Pechenkov v. Holder*, 705 F.3d 444, 452 (9th Cir. 2012) (Graber, J., concurring) ("We have strayed from the statute and, in the process, seemingly created a circuit split.")

---

[8]"Courts do not usually raise claims or arguments on their own. But federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." (internal quotation marks omitted)).

While we previously have acknowledged the existence of the Ninth Circuit's "on-the-merits" exception, we have not adopted it, and we decline to do so now.[9] *See Khodr v. Holder*, 531 F. App'x 660, 665 (6th Cir. 2013) ("We need not address this complex statutory-interpretation question because we conclude for the reasons provided *infra* that, even assuming that § 1252(a)(2)(C) does not apply to Abou Khodr's petition, nevertheless the BIA's determination was supported by reasonable, substantial, and probative evidence on the record considered as a whole."); *see also Gonzalez v. Holder*, 570 F. App'x 549, 552 (6th Cir. 2014) (citing *Khodr* and avoiding reaching the jurisdictional issue in the same manner).

Section 1252(a)(2)(C) states in pertinent part: "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed [a controlled substance offense]." The Ninth Circuit construes the statute's "by reason of" phrase as applied to the *order of removal*—thereby limiting the jurisdictional bar to cases in which the relevant conviction is the final reason for that order. As Judge Graber's concurrence propones, *Pechenkov*, 705 F.3d at 449-50, we believe that a more accurate reading of the statute is one where the jurisdictional bar is applied to any order of removal "against an alien who is *removable* by reason of having committed" a relevant crime. 8 U.S.C. § 1252(a)(2)(C) (emphasis added); *Pechenkov*, 705 F.3d at 451-52 (Graber, J., concurring) ("[T]he applicability of § 1252(a)(2)(C) is a straightforward inquiry: Was the alien charged with removability because of a relevant crime, and did the IJ correctly sustain that charge? If so, we lack jurisdiction over all questions not covered by § 1252(a)(2)(D).").

The Seventh Circuit also departs from the statute as we understand it, but for different reasons. *See Issaq v. Holder*, 617 F.3d 962, 969-70 (7th Cir. 2010) (holding that because deferral of removal is an inherently non-final remedy, § 1252(a)(2)(C), which speaks only of a final order, appears to be inapplicable); *see also Wanjiru v. Holder*, 705 F.3d 258, 264 (7th Cir. 2013) ("A deferral of removal is like an injunction: for the time being, it prevents the government from removing the person in question, but it can be revisited if circumstances change. That is why such an order can be final enough to permit judicial review, but at the same time not be the kind of "final" order covered by § 1252(a)(2)(C).")

---

[9]As *Khodr* points out, "[i]t is unsettled whether § 1252(a)(2)(C)'s applicability to deferral-of-removal cases remains an open question in the Sixth Circuit." *Khodr*, 531 F. App'x at 665 n.3.

As the Attorney General argued in *Perez-Guerrero v. U.S. Attorney General*, "[t]he Seventh Circuit's analysis fails adequately to recognize that the court's jurisdiction under 8 U.S.C. 1252(a)(1) is limited in the first place to 'final orders of removal,' a term that has been interpreted by [the Supreme] Court to include all rulings on relief and protection from removal . . . reflected in the definition of 'order of [removal]' in 8 U.S.C. 1101(a)(47)." Br. for Respondent at 18, *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224 (11th Cir. 2013) (per curiam) (No. 12-10261), *cert. denied sub nom. Perez-Guerrero v. Holder*, 134 S. Ct. 1000 (2014) (second alteration in original), 2013 WL 6503528, at *18. Furthermore, even if deferral of removal is inherently non-final, the BIA's denial of deferral relief—the matter which is currently before us—is absolutely final. *Id.* Accordingly, we continue to uphold the statutory interpretation that the vast majority of circuits—including our own—repeatedly have applied. *See, e.g.*, *Luambano,* 565 F. App'x at 412 (Merritt, Cook, Donald, JJ.); *Mendoza-Rodriguez*, 564 F. App'x. at 223; *see also Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 532-33 (11th Cir.), *cert. denied sub nom. Cole v. Holder*, 134 S. Ct. 158 (2013); *Gallimore v. Holder*, 715 F.3d 687, 690 (8th Cir. 2013); *Escudero-Arciniega v. Holder,* 702 F.3d 781, 785 (5th Cir. 2012) (per curiam); *Gourdet v. Holder*, 587 F.3d 1, 5 (1st Cir. 2009); *Saintha v. Mukasey*, 516 F.3d 243, 248 (4th Cir.), *cert. denied*, 555 U.S. 1031 (2008); *Ilchuk v. Att'y Gen.*, 434 F.3d 618, 624 (3d Cir. 2006).

To the extent that Ventura-Reyes has raised constitutional claims or questions of law, we review those issues de novo. *See Stserba v. Holder*, 646 F.3d 964, 971 (6th Cir. 2011) (citing *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009)); *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "Where the BIA adopts the IJ's reasoning, we review the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005) (per curiam). Here, although the BIA did not summarily adopt the IJ's decision, it merely paraphrased the IJ's findings and expressly concurred with his decision. Therefore, we review the decision of the IJ while considering any additional analysis by the BIA. *Id.* at 283.

III.

Ventura-Reyes first argues that the BIA committed an error of law in upholding the IJ's adverse-credibility determination against his uncle, Felipe Reyes.[10]  We disagree.  "Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed [by the BIA] only to determine whether the findings of the immigration judge are clearly erroneous."  8 C.F.R. § 1003.1(d)(3)(i).  The BIA noted its obligation to review the IJ's adverse-credibility finding for clear error.  The BIA then summarily affirmed the IJ's finding that Felipe Reyes was neither reliable nor credible.

Ventura-Reyes argues that "[c]redibility was never analyzed or discussed by the [BIA] in its decision."  Pet'r's Reply Br. at 8.  The BIA routinely upholds an IJ's adverse credibility findings without additional analysis or discussion.  The BIA's conclusions must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole. . . ." *Gjyzi v. Ashcroft*, 386 F.3d 710, 716 (6th Cir. 2004) (quoting 8 U.S.C. § 1105(a)(4)) (internal quotation marks omitted).  However, we have held that "the BIA need not write extensively on every issue—indeed, we have joined our sister circuits in holding that 'the BIA's streamlining procedures,' such as summary affirmances of IJ decisions, 'do not themselves alone violate an alien's right to due process.'"  *Id.* (quoting *Denko v. I.N.S.*, 351 F.3d 717, 730 (6th Cir. 2003)); *see also Denko*, 351 F.3d at 727 (holding that when the BIA "issue[s] a decision affirming an IJ's decision without stating the basis for such affirmance[, t]his affirmance implies that the IJ decided the case correctly, any errors committed by the IJ were immaterial or harmless, and . . . the issue is squarely controlled by precedent and does not involve a novel factual issue"); *but see Damsyik v. Att'y Gen.*, 393 F. App'x 845, 849 (3d Cir. 2010) ("The BIA provided scant analysis of the question of whether sufficient evidence of a 'well-founded fear of persecution' existed. We therefore direct the BIA, upon remand, to clarify its treatment of this issue. . . ." (citation omitted)).

---

[10]To the extent that Ventura-Reyes argues that the BIA failed to consider his role as a DEA informant when upholding the IJ's factual findings in denying deferral relief, we find that the BIA committed no error (legal or otherwise) because the BIA concurred while expressly stating that the IJ "considered [Ventura-Reyes'] testimony in which [he] revealed his minimal role as a government informant," and proceeded to describe the testimony in further detail.  A.R. 5.

Though on appeal we generally review the IJ's and BIA's factual findings for substantial evidence, *see Khalili*, 557 F.3d at 435, here the jurisdictional bar resulting from Ventura-Reyes' drug conviction precludes us from doing so. *Luamabano*, 565 F. App'x at 414. Left only with the ability to bring constitutional and legal challenges to the IJ's credibility determination concerning Felipe Reyes, Ventura-Reyes' briefing strains to shape allegations most naturally read as disagreements with the IJ's weighing of the evidence into allegations that the IJ committed an error of law.

Credibility must be determined by the totality of circumstances and all relevant factors, 8 U.S.C. § 1158(b)(1)(B)(iii), and adverse credibility determinations must be supported by specific reasons, *Zhao v. Holder*, 569 F.3d 238, 244-45 (6th Cir. 2009). Ventura Reyes argues that the IJ failed to meet these requirements when making his adverse credibility determination against Felipe Reyes because the IJ's oral opinion did not compare Felipe Reyes' testimony with documentary evidence in the case and made an erroneous observation about the date of one of Felipe Reyes' visits to the Dominican Republic. Pet'r's Br. 26. But though the failure to apply a required legal test or standard can constitute legal error allowing for review, there is no sign that the IJ committed any such error in this case.

The IJ heard Felipe Reyes's testimony and interjected in several places to confirm his understanding that aspects of the testimony where speculative or based on events that took place in the Dominican Republic while Felipe Reyes was not actually in the country. Upon reviewing the evidence, the IJ concluded that Felipe Reyes was not reliable or credible because he (1) was not in the Dominican Republic when the 1989 murder of Peguero took place; (2) contradicted Ventura-Reyes' testimony that he fled the Dominican Republic within three months after the Peguero murder by testifying that Ventura-Reyes left one-and-a-half to two years after the Peguero murder; (3) lacked first-hand knowledge of the events surrounding Ventura-Reyes' alleged role as a DEA informant; (4) testified that Noel Ventura-Reyes was choked to death, which contradicted the indication of cardio pulmonary arrest as the cause of death in the deceased's death certificate; and (5) contradicted his own testimony that he did not trust the Dominican police by stating that he used Dominican police as personal bodyguards.

We recognize that distrusting the police in general would not necessarily preclude having allies within the force or hiring specific bodyguards.

However, upon review here, we do not inquire whether we would have weighed or interpreted a particular set of facts differently. We may only consider whether the IJ failed to apply a required test or legal standard, or failed to fully implement all steps of a test with required elements. We conclude that when making an adverse credibility determination against Felipe Reyes, the IJ considered the totality of the circumstances and provided reasons for his conclusions, as he was required to do under § 1158(b)(1)(B)(iii). His decision to highlight some pieces of evidence in the record over others when reaching those conclusions does not change our result, as that concerns impermissible review of his fact-finding rather than an assessment of whether he committed constitutional or legal error. *See Ettienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011).

While we caution that challenges to fact-finding may be disguised as questions of law in order to evade the jurisdictional bar we face here, we acknowledge that some courts have held that certain factual errors can be sufficiently severe to actually constitute reviewable errors of law. *See Navarro v. Holder*, 505 F. App'x 441, 445 (6th Cir. 2012) (citing *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009) (holding, in the context of a discretionary denial of cancellation of removal premised on a hardship waiver and that is subject to a virtually identical jurisdictional bar, that where important facts "have been *totally overlooked* and others have been *seriously mischaracterized*, we conclude that an error of law has occurred.") (emphasis added)).

Ventura-Reyes' argument concerning the IJ's adverse credibility determination as to Felipe Reyes heads in this direction when it discusses the IJ's confusion about a particular date (of Felipe Reyes' 2012 visit to the Dominican Republic), the IJ's failure to expressly weigh Felipe Reyes' testimony against documentary evidence in the record, and the IJ's determination that Felipe Reyes' conclusions were "biased" in favor of his family. Pet'r's Br. 27-28. But the date at issue was not central to the case and did not weigh against Felipe Reyes' credibility. The IJ did in fact weigh Felipe Reyes' speculation about Noel Ventura-Reyes' cause of death against documentary evidence, the deceased's death certificate. Ultimately, Ventura-Reyes' arguments

fail to convince us that the IJ made any finding of fact so clearly wrong as to constitute a legal error that escapes the jurisdictional bar.

## IV.

Ventura-Reyes next argues that the BIA's affirmance of the IJ's decision to exclude late-filed documentary evidence contained an error of law and violated his due process rights. We disagree. By statute, IJs may set and extend time limits for filing of applications and related documents and responses thereto, if any—*i.e.*, the setting and extension of deadlines is discretionary, not mandatory. 8 C.F.R. § 1003.31(c). Legal errors in evaluating timeliness typically involve mistakes in establishing dates of past events when such dates form the basis for calculating filing deadlines (such as an asylum applicant's ambiguous date of entry used in calculating the one-year-filing deadline). *See, e.g., Gjyzi*, 386 F.3d at 714. There was no potential for such legal error in this case. Moreover, Ventura-Reyes does not allege that the IJ misinterpreted the dates of the news articles in finding their submission to be untimely.

Dates aside, an IJ's decision as to what exhibits to accept into evidence is discretionary. Where, as here, the IJ placed a limit on the submission of additional evidence, with no objection from Ventura-Reyes, and then accepted additional evidence when a witness became unavailable, the IJ's decision and cannot form the basis for a due process claim. *See Amir v. Gonzales*, 467 F.3d 921, 924 (6th Cir. 2006) ("In this case, the question of whether to admit or not admit evidence is not a constitutional question nor one involving statutory construction."). Indeed, Ventura-Reyes acknowledges in his appeal brief that an IJ "*may set and extend* time limits for the filing of applications and related documents and responses thereto, if any." Pet'r's Br. at 33 (citing 8 C.F.R. § 1003.31(c)) (emphasis added). In the absence of any constitutional claim or question of law, we may not review the IJ's decision with respect to the late-filed documentary evidence.

## V.

Finally, Ventura-Reyes argues that the BIA erred in affirming the IJ's misinterpretation of 8 C.F.R. § 1208.18(a)(1). We review this challenge de novo because it involves a question of

statutory interpretation.**[11]** *Khalili*, 557 F.3d at 435; *see also Nerghes v. Mukasey*, 274 F. App'x 417, 422 (6th Cir. 2008) ("Our circuit has stated that the phrase 'questions of law' in § 1252(a)(2)(D) means 'matters of statutory construction.'" (quoting *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006))). "Questions of law are reviewed de novo, but substantial deference is given to the BIA's interpretation of the INA and accompanying regulations. The BIA's interpretation of the statute and regulations will be upheld unless the interpretation is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Khalili*, 557 F.3d at 435 (quoting *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)); *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999).

CAT "[p]rotection . . . will be granted either in the form of withholding of removal or in the form of deferral of removal." 8 C.F.R. § 1208.16(c)(4). "Ordinarily, an alien entitled to CAT protection receives relief in the form of withholding of removal." *Khodr*, 531 F. App'x at 664. However, an alien will instead receive deferral of removal when: (1) the alien "has been ordered removed; [(2)] has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and [(3)] is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3).'" *Id.* (quoting 8 C.F.R. § 1208.17(a)). "Deferral of removal offers temporary relief, in that it may be terminated under specific circumstances by an IJ, by the Attorney General, or by the alien himself." *Id.* (citing 8 C.F.R. § 1208.17(d)-(f)).

To receive CAT relief (either in the form of withholding of removal or of deferral of removal), a petitioner must prove "that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see also* 8 C.F.R. § 1208.17(a) (setting the same requirements for a petitioner seeking deferral of removal as a petitioner seeking withholding of removal); *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1139 (6th Cir. 2010). The regulations define torture as "any act by which severe pain or suffering . . . is intentionally inflicted . . . when such pain or suffering is inflicted by or at the instigation of or *with the consent or acquiescence of a public official or other person acting in an official capacity*." 8 C.F.R. § 1208.18(a)(1) (emphasis added). "Acquiescence of a public official

---

**[11]**Though this argument was raised in closing by Ventura-Reyes' counsel at the merits hearing on August 21, 2013, neither the IJ nor the government appear to address it specifically in their appellate briefing.

requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *see also Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001).

At issue is what constitutes "consent or acquiescence of a public official . . . acting in an official capacity." Ventura-Reyes argues that he is likely to be tortured by members of the Peguero and/or Gonzalez Molina families with the consent or acquiescence of Dominican police because those families have infiltrated the ranks of the police. In his decision, the IJ properly stated the standard and burden of proof. However, the IJ found that Ventura-Reyes failed to meet his burden of proof because (1) Ventura-Reyes stated that Dominican police and/or military had come to his aunt's house and provided assistance in the aftermath of the September 1989 violence involving his family and the Pegueros; (2) both Ventura-Reyes and Felipe Reyes testified that their own family has friends and/or connections within the Dominican police; (3) Ventura-Reyes was not harmed while in police custody for questioning after the death of Julian Peguero Rojas in September 1989; and (4) the Dominican police investigated the incident and prosecuted and imprisoned the individual responsible for the murder. The IJ also found that:

> While abuses of prisoners by police are reported in the United States Department of State Country Report, *the leadership* of those police agencies take such behavior seriously and deal with it seriously when they become aware of it. The Country Report does not suggest that police, military or other government officials would willfully turn a blind eye to the torture of one citizen of the Dominican Republic by another citizen or by criminal elements in a society.

A.R. 105 (emphasis added).

In his petition, Ventura-Reyes challenges the IJ's interpretation of the statute, which allegedly excuses abuses by low-level government officials because officials in leadership positions do not condone such behavior. Ventura-Reyes argues that the actions of low-level police, irrespective of their leadership, can satisfy the requirements of 8 C.F.R. § 1208.18(a)(1). Pet'r's Br. at 38 (citing *Marmorato*, 376 F. App'x at 386 ("The IJ erred in limiting its official capacity inquiry to only those agents at the highest levels of national government, to the exclusion of those agents lower in the chain of command whom [the petitioner] claims would acquiesce in the anticipated torture.")); *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900-01 (8th Cir.

2009). Neither *Marmorato* nor *Ramirez-Peyro* is binding upon this Court. Even if they were, both are distinguishable.

In *Marmorato*, the petitioner was "fearful because his information helped secure the conviction of an inmate for contraband violations, and both the inmate and the inmate's brother had strong connections to Italian families who had government ties." *Marmorato*, 376 F. App'x at 382. In the instant case, Ventura-Reyes played at best a nominal, indirect role as an informant, and it is doubtful whether anyone was aware of it. Furthermore, Ventura-Reyes presented little proof that anyone affected by his role as an informant had ties to the Dominican government.[12] *Ramirez-Peyro* involved "wide-scale police participation in harmful actions on behalf of [a] Cartel," 574 F.3d at 905, which distinguishes it from the instant case, in which the IJ found that the leadership of police agencies in the Dominican Republic takes abusive behavior seriously and deals with it seriously.

Ventura-Reyes also cites a case in which we granted a petitioner who feared torture upon removal to Jamaica relief under the CAT because Jamaican police were "crooked," "corrupt," and working with the men who would harm him. *Gray v. Holder*, No. 11-4061, 2012 U.S. App. LEXIS 27220, at *7-8 (6th Cir. Nov. 9, 2012). *Gray* is distinguishable from this case because several reports in *Gray* indicated that the Jamaican police was plagued by rampant corruption and failed to protect people from violent crime. *Id.* ("The reports documenting police corruption and failure to protect citizens from violent crime, standing alone, do not compel a finding that the government would acquiesce in torture carried out by drug traffickers. However, they do lend credence to [the petitioner's] specific allegation that the Jamaican police were corrupt and were working with the men who were searching for him."). To the contrary, in the instant case, both the country report concerning police at the national level and Ventura-Reyes' own testimony—that state agents in his community protected his family and his aunt's house during the 1989 incident with the Peguero family—support a finding that he has failed to carry his burden of proving that it would be more likely than not that state agents would acquiesce in his torture

---

[12]The record contains evidence that the Peguero family was politically active and had government ties in the Dominican Republic. By contrast, there is little evidence, beyond speculation, that the Gonzalez Molina family had government ties.

upon his return. The IJ did not treat the country report as dispositive. Rather, it was one of several pertinent pieces of evidence that he was correct to consider.

Even if the IJ and BIA erred in statutory construction, the IJ held that Ventura-Reyes still failed to meet his burden of proof on several other issues. Specifically, he failed to show (1) that it would be "more likely than not" that he would suffer torture if returned to the Dominican Republic on the basis of lingering suspicions regarding his involvement, if any, in the Peguero killing; (2) that it was more likely than not that he provided DEA assistance; and (3) that it was more likely than not that anyone was aware of his provision of assistance such that they would want to retaliate against him by torturing him as a consequence of his alleged informant role. Finding the BIA's interpretation of 8 C.F.R. § 1208.18(a)(1) to be neither arbitrary and capricious, nor manifestly contrary to the statute, we uphold its affirmance of the IJ's determination.

## VI.

For the foregoing reasons, we **DENY** the petition with respect to the challenged interpretation of 8 C.F.R. § 1208.18(a)(1), and **DISMISS** the remainder for lack of jurisdiction.