NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0346n.06

Case No. 24-4015

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

JHOAN SEBASTIAN RUANO-FLAUTERO;
ANGY MARCELA SUAREZ-YELA; J.M.T.S.

    Petitioners,

v.

PAMELA BONDI, Attorney General,

    Respondent.

</td><td>

)
)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**
Jul 15, 2025
KELLY L. STEPHENS, Clerk

ON PETITION FOR REVIEW
FROM THE UNITED STATES
BOARD OF IMMIGRATION
APPEALS

O P I N I O N

</td></tr>
</table>

Before: THAPAR, NALBANDIAN, and READLER, Circuit Judges

**NALBANDIAN, Circuit Judge**.   Jhoan Ruano-Flautero and Angy Suarez-Yela seek asylum and withholding of removal, which the Board of Immigration Appeals refused.  Because the record supports the agency's decision, we deny the petition.

**I.**

Ruano-Flautero and Suarez-Yela, Colombian citizens, entered the United States unlawfully in 2022.  The couple brought with them Suarez-Yela's minor son, J.M.T.S., from a previous relationship.  But shortly after they arrived, the government began removal proceedings against them.

They asked for asylum and withholding of removal.  Ruano-Flautero claimed that he'd been persecuted for participating in anti-government protests, while Suarez-Yela claimed that the Colombian police refused to protect her from her abusive ex-boyfriend (J.M.T.S's father).  But an

Immigration Judge (IJ) denied their request. Among other reasons, he found Ruano-Flautero not credible based on discrepancies between his testimony and application papers. And he concluded that Suarez-Yela hadn't met the asylum standard—she had neither proposed a cognizable social group nor shown that that the police left her helpless.

The couple appealed to the Board of Immigration Appeals (BIA), which affirmed largely on those grounds. The BIA upheld the IJ's credibility and police-assistance findings. And it left in place the IJ's ruling against Suarez-Yela's proposed social group because she didn't meaningfully contest it on appeal. So the couple petitioned for review here.

## II.

To gain asylum, an alien must be a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). Federal law defines a "refugee" as someone "who is unable or unwilling" to return to his home country "because of persecution or a well-founded fear of persecution" on account of certain traits, like "membership in a particular social group." *Id.* § 1101(a)(42). "Persecution" has a state-action component. The country's government must either (1) directly persecute the alien, or (2) be unable or unwilling to prevent private actors from persecuting him. *Palucho v. Garland*, 49 F.4th 532, 535–36 (6th Cir. 2022). The alien bears the burden of proof to establish refugee status. 8 U.S.C. § 1158(b)(1)(B)(i). And if he doesn't carry that burden, any request for withholding of removal necessarily fails, too. *Vasquez-Rivera v. Garland*, 96 F.4th 903, 908 (6th Cir. 2024).

We review the BIA's ruling as the final agency action, though when the BIA adopts the IJ's rationale, we review the IJ's decision too. *Id.* at 907. We review any factual findings "highly deferential[ly]," for substantial evidence. *Owusu v. Garland*, 91 F.4th 460, 463 (6th Cir. 2024) (internal quotation marks omitted); *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1035 (6th Cir. 2019). So "unless the evidence *compels* a different result," we cannot second-guess the agency, even if

we would've made a different call in the first instance. *Owusu*, 91 F.4th at 463 (internal quotation marks omitted); *see* 8 U.S.C. § 1252(b)(4)(B).

**A.**

We first consider Ruano-Flautero. His claim for asylum rests on alleged political-opinion persecution at the hands of Colombian police after he attended anti-government protests. Citing inconsistencies between his testimony and asylum application, the BIA found him not credible.

Credibility findings are factual findings, and we afford them great deference. They can rest on inconsistencies, inaccuracies, or falsehoods, which need not go to the heart of the alien's claim. *See Luna-Romero v. Barr*, 949 F.3d 292, 295 (6th Cir. 2020). Still, an adverse credibility decision "must be supported by specific reasons." *Ventura-Reyes v. Lynch*, 797 F.3d 348, 359 (6th Cir. 2015), *abrogated on other grounds by Nasrallah v. Barr*, 590 U.S. 573, 578–79 (2020). But if it is, then that decision is generally "fatal to claims for asylum and relief from removal, preventing such claims from being considered on their merits." *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014).

The record contains a few discrepancies in Ruano-Flautero's story, which the BIA reasonably relied on in doubting his credibility. First, Ruano-Flutero couldn't quite settle on the dates and facts of the protests he attended. And second, when testifying before the IJ, he added new details about his post-protest harassment by the police (details not in his application), which one could reasonably interpret as embellishment.

Start with the protest timeline. In his asylum application, Ruano-Flautero wrote that he attended two protests in 2021. And he specified that police fired tear gas at him at the first protest. But he later told the IJ that he attended one protest in 2019, and another in 2021. That's a difference of years, not mere days or months. He also stated that police tear gassed him at the second protest,

3

not the first. A third version of the story appears in Ruano-Flautero's official declaration—where he identified only one protest he attended, in 2021. When asked by the IJ to explain these inconsistencies, Ruano-Flautero didn't offer a clear answer. He said that someone had died at the 2019 protest, which had led him to head home early, and that he stuck around longer at the second protest (which, to keep confusing things, he called the "2022" protest). That might explain why Ruano-Flautero was tear gassed at one protest, and not the other. But it doesn't address why Ruano-Flautero used different dates and reversed the tear gas incidents between his application and his testimony. And non-answers, unsatisfactory answers, or vague answers suffice for an adverse credibility finding. *See Luna-Romero*, 949 F.3d at 296; *Gjonaj v. Holder*, 398 F. App'x 98, 109 (6th Cir. 2010).

The evolving details about police harassment also raised red flags for the BIA. At the hearing, Ruano-Flautero testified that after he participated in the 2021 protest, the police hounded him—they stopped and searched him, asked for his papers, called him names, and even assaulted him. When asked how often these incidents took place, he described them as "quite habitual," "between 20 to 25 times." A.R. 356. He stated that most incidents took place in front of his house, with family watching and his mother-in-law sometimes intervening. But these events weren't detailed in Ruano-Flautero's application or declaration.

Nor did they appear in the letter his mother-in-law wrote supporting his petition. While Ruano-Flautero testified that his mother-in-law repeatedly witnessed the police harassing him, and that she "would frequently come out to [his] defense," A.R. 358, she mentioned no such thing in the letter she wrote to the agency. She described the protests and tear gas in detail, and even noted that after the protests, the police would follow and beat young people in the street—but did not mention the same thing happening to her own son-in-law or her own intervention. These

4

inconsistencies struck the BIA as odd. And they provided reasonable grounds for questioning whether Ruano-Flautero was exaggerating or embellishing his story. *See Kolov v. Garland*, 78 F.4th 911, 922 (6th Cir. 2023) (one "could reasonably interpret . . . evolving claims as not credible, devised only to strengthen [the alien's] claim as it proceeded," when he "added new instances of ethnic harassment as his claim proceeded," "despite opportunity to disclose each" from the start), *abrogated on other grounds by Riley v. Bondi*, 145 S. Ct. 2190 (2025); *Luna-Romero*, 949 F.3d at 296 (alien not being entirely "accurate and forthcoming" supported adverse credibility finding (internal quotation marks omitted)).

Ruano-Flautero offers several explanations for the timeline mix-up and the omitted harassment details. The timeline issue could be a "typographical error in his application that was prepared through a translator," he suggests. Petitioners Br. at 17–18. Or he merely "misremembered when the first protest took place." *Id.* at 18. And in any event, he adds, these details weren't "important to [his] substantive testimony." *Id.* As for the missing details about police harassment, Ruano-Flautero claims that he didn't think them important enough to include on his application form but that he shouldn't be penalized for not offering every detail up front. *Id.* at 21. He also maintains that one sentence in his declaration did refer to the police harassment he experienced, and that the BIA simply misread it. *Id.* at 21–22.

These explanations cannot overcome our deferential review. To start, the declaration's sentence (composed in broken English) reads ambiguously—it mentions "a moment" (singular) after the 2021 protest in which "police were chasing you to hit you or take you away." A.R. at 465. While theoretically susceptible to a reading that refers specifically to Ruano-Flautero, and that "*a*" moment could've meant "*many*," that's not the only possible reading. Nor is it the most obvious one. The agency could've reasonably read this sentence to refer instead to the police

generally tailing young people as the protesting masses dispersed, not specifically tracking Ruano-Flautero for months afterward.

The rest of his explanations are also plausible—but not overwhelming or inescapable. And "a plausible explanation is not enough on appeal to overcome an adverse credibility determination." *Luna-Romero*, 949 F.3d at 296–97 (internal quotation marks omitted). We grant that someone *could* have mistyped a date. Or that Ruano-Flautero *could* have misremembered the dates. Or that he *could* have thought certain details less important than others. But mere possibilities don't pass our standard of review.

The BIA gave "specific reasons" for its findings, *Ventura-Reyes*, 797 F.3d at 359, and the record—on our own review—doesn't "compel a different result," *Owusu*, 91 F.4th at 463 (citation modified). So Ruano-Flautero's claim can't succeed.

**B.**

We next consider Suarez-Yela. Her claim for asylum stems from her past relationship with an abusive and violent ex-boyfriend, Jayson. The IJ found that her proposed protected social group—"Colombian females unable to leave their relationship"—wasn't cognizable and that the government wasn't unable or unwilling to protect her.

Suarez-Yela did not "meaningfully challenge[]" the IJ's social-group decision before the BIA. A.R. 5. Though her brief now argues that the IJ erred, she doesn't challenge the BIA's ruling that she failed to develop the issue. This means that she left it unexhausted at the administrative level, and we do not review unexhausted issues. *See Harmon v. Holder*, 758 F.3d 728, 737 (6th Cir. 2014); *see also* 8 U.S.C. § 1252(d)(1) (requiring "exhaust[ion of] all administrative remedies").

We also decline to overturn the BIA's finding on the police-protection question (another factual finding that we review deferentially, *see Palucho*, 49 F.4th at 536). Since Jayson isn't a state actor, Suarez-Yela faced a high burden. She had to show that she couldn't "reasonably expect the assistance of the government in deterring" him. *Id.* (internal quotation marks omitted). Put differently, she had to show that the government either "condoned the private violence" or "demonstrated a complete helplessness" in protecting her. *Id.* (internal quotation marks omitted).

Jayson clearly inflicted appalling physical and psychological abuse on Suarez-Yela during their relationship. The record shows that for years, he constantly beat her, insulted her, and threatened her. He often did so in the presence of their young son, J.M.T.S. Jayson once stabbed her in the leg for no apparent reason and smashed a beer bottle over her head. Eventually she secured a restraining order against him, but he violated it multiple times, breaking down her door and at times taking away J.M.T.S. Suarez-Yela testified that he made her life "hell." A.R. 297. Eventually, Jayson left her and started dating another woman, but he threatened to kill Suarez-Yela or "throw acid" on her face if she dated another man. *Id.* at 308. This kind of problem appears to plague the country, too. For example, the record contains the U.S. State Department's 2021 Human Rights Report, which details how domestic abuse and violence against women "continue[s] to be a problem" in Colombia. *Id.* at 533.

But, as the BIA found, the record also makes clear that law enforcement didn't sit around and do nothing. Whenever Suarez-Yela called the police on Jayson, they came and removed him from her home. Sometimes, they even beat him. The final time Jayson appeared at her house before she left Colombia, she called the police on him and he "took off running." *Id.* at 317. Other times, she didn't call the police at all. But she testified that any time she did call—which she

estimated was about one hundred times over the years—the police always came.  So the evidence cuts multiple ways, which doesn't permit us to substitute our judgment for the BIA's.

And while Colombia has a domestic-violence problem, the Human Rights Report also notes that the government hasn't neglected it.  Several national agencies, including the Attorney General's office and the Ministry of Defense, have special programs to combat violence against women, and the country tries to enforce its laws against sexual assault.  We've held that similar country conditions don't require a finding of state-sanctioned persecution.  *See Palucho*, 49 F.4th at 537 (collecting cases).

It's possible that there was more that law enforcement could have done to help Suarez-Yela.  She testified that they never handcuffed or arrested Jayson.  And he was never prosecuted.  Yet that doesn't negate the fact that the police did *something* to help her, and the persecution standard asks whether they did next to nothing.  *E.g.*, *Reyes Almendarez v. Barr*, 817 F. App'x 35, 41 (6th Cir. 2020) ("Local police were responsive to each of petitioners' crises," even though "no arrests were made, nor charges brought," so the alien couldn't establish state-sanctioned persecution).  We can't say that the police "condoned [Jayson's] violence" or "demonstrated a complete helplessness" in trying to protect Suarez-Yela, *Palucho*, 49 F.4th at 536 (internal quotation marks omitted); the record doesn't compel that result.  So Suarez-Yela's claim can't succeed.

**III.**

For these reasons, we deny the petition.